# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CHRISTINE MARAIS,**

    **Plaintiff,**

              **Case No. 2:11-cv-314**
              **JUDGE SMITH**
  **v.**            **Magistrate Judge Abel**

**CHASE HOME FINANCE, LLC,**

    **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant, Chase's, motion for summary judgment (Doc. 42), Plaintiff, Marais', motion for partial summary judgment (Doc. 43), and Chase' motion to strike (Doc. 51). For the reasons that follow, Chase's motion for summary judgment (Doc. 42) is **DENIED**, Marais' motion for partial summary judgment (Doc. 43) is **GRANTED in part** and **DENIED in part**, and Chase' motion to strike (Doc. 51) is **DENIED as moot**.

## I. POSTURE

Plaintiff, Christine Marais, brought an action with claims for state common law conversion as well as violations of the Truth in Lending Act (TILA), 15 U.S.C. § 1641(f)(2), the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605(e), and the Ohio Consumer Sales Practices Act (OCSPA), Ohio Revised Code, section 1345.01, *et seq.* against her loan servicer, Defendant, Chase Home Finance, LLC. (Doc. 1, Compl. *in passim*). This Court decided, upon motions for judgment on the pleadings, that Marais had failed to adequately state a claim for violations of TILA and RESPA. (Doc. 33, Order on Mots. for JOP at 5-12). Having so decided, the Court declined to exercise supplemental jurisdiction over Marais' state law claims in

the absence of any remaining federal claims. *Id.* at 12-13. The Sixth Circuit Court of Appeals affirmed this Court's decision as to the insufficiently alleged violations of TILA, but reversed as to the alleged violations of RESPA. *Marais v. Chase Home Fin. LLC*, 736 F.3d 711 (6th Cir. 2013). Thus, at this stage of the litigation, Marais retains claims for violations of RESPA and Ohio state law.

## II.    BACKGROUND AND INTRODUCTION

In 2006, Marais obtained a refinancing on her home. (Doc. 42, Ex. A-1, Loan Documents at 3-40). The monthly payment according to the note was to be $1,064.80.[1] (Doc. 42, Ex. A-1, Note at 77). The lender, Residential Finance Corp., obtained a mortgage on the property. (Doc. 42, Ex. A-1, Mortgage at 41-55). It is unclear when Defendant, Chase, got involved, however it is clear that by the time the events relevant to this suit transpired, Chase was the servicer of the loan.

The undisputed evidence in the record reflects that in November 2007 Marais made a payment of $1,600. Chase allocated that payment as follows: $186.77 to principal; $878.03 to interest; $313.99 to escrow; and $221.21 to "miscellaneous or fees." (Doc. 43, Ex. A-3, Loan Stmnt. at 25). The statement from Chase also instructed, "Chase has funds in the amount of $221.21 that have not been applied to your account. Please contact the Customer Care number above and tell us how you would like these funds applied to your account." *Id.* In addition, the original loan note provided as follows, "I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a 'Prepayment.' When I make a Prepayment, I will tell the Note Holder in writing that I am doing so." (Doc. 42, Ex. A-1, Note at 77). There is no indication in the record whether or not Marais told Chase how she

---

[1] However, as is usual, some additional sum was to be collected and escrowed for payment of projected taxes. *See* 12 U.S.C. § 2609 (2012).

wanted the $221.21 allocated nor is there any evidence as to how, if ever, the $221.21 was allocated.

At some point (the record is not clear on exact timing), Marais fell behind on payments. She worked out a resolution with Chase by telephone and accordingly, on January 25, 2008, Chase sent her a repayment plan for a past-due amount of $2,968.64 to be repaid in conjunction with Marais' regular payments. (Doc. 43, Ex. A-4, Repay Plan at 26). In order to accept the plan and avoid foreclosure, Marais was instructed to sign and return the repayment plan agreement. *Id.* The record does not reflect whether Marais ever formally accepted Chase's offered repayment plan by signing but it is undisputed that Chase did not institute foreclosure action against Marais as it threatened to do had she refused to agree to the plan. *Id.* The following chart shows the due dates and amounts of repayment under the plan and the dates and amounts of repayment actually made by Marais:

| **Date Due** | **Amount Due** | **Date Paid** | **Amount Paid** |
|---|---|---|---|
| 01/24/08 | $1,544.56 | No Records[2] | No Records |
| 02/23/08 | $1,542.81 | 02/25/08 | $1,542.81 |
| 03/23/08 | $1,542.81 | 03/21/08 | $1,542.84 |
| 04/23/08 | $1,542.81 | 04/22/08 | $1,543.00 |
| 05/23/08 | $1,542.81 | 05/22/08 | $1,542.90 |
| 06/23/08 | $1,542.81 | 06/23/08 | $1,543.00 |
| 07/23/08 | $1,542.81 | 07/23/08 | $1,543.00 |
| 08/23/08 | $1,542.81 | 08/22/08 | $1,543.00 |
| 09/23/08 | $1,542.81 | 09/22/08 | $1,543.00 |
| 10/23/08 | $1,542.81 | 10/22/08 | $1,545.00 |
| 11/23/08 | $1,542.81 | 11/24/08 | $1,543.00 |
| 12/23/08 | $1,542.81 | 12/22/08 | $1,543.00 |

(*Compare* Doc. 43, Ex. A-4, Repay Plan at 26 *with* Doc. 43, Ex. A-5, Payment Receipts at 28-38). As is evident from the chart, the record reflects (to the extent records are before this Court)

---

[2] On the repayment plan itself, a handwritten note appears next to this scheduled payment, "Paid 1/26. Request dated 1/25." (Doc. 43, Ex. A-4, Repay Plan at 26). Though no receipts exist to confirm this payment, there is also no evidence to suggest the amount went unpaid. Moreover, as the repayment plan was, itself, dated 1/25, it is a bit inequitable of Chase to make a payment due, pursuant to the plan, on 1/24 and count it late when received on 1/26.

3

that Marais paid the amounts due (or slightly in excess thereof) on time with two minor exceptions; in February and November she paid 2 and 1 days late respectively. During this same period, Chase sent Marais default letters approximately monthly, demanding payments of amounts that varied with each letter from $2,916.40 up to $3,520.96. (Doc. 43, Ex. A-6, Default Notices at 39-48). Each of these default letters listed the payment due dates as the 1st of the month, rather than the dates designated by Chase in the repayment plan. *Id.*

After the expiration of the repayment plan, Marais continued to make payments on her loan in excess of the amounts due. The record reflects that she paid as follows:

| **Date Paid** | **Amount Paid** |
| --- | --- |
| 01/13/09 | $1,543.00 |
| 02/06/09 | $1,500.00 |
| 03/12/09 | $1,500.00 |
| 04/09/09 | $1,500.00 |
| 05/13/09 | $1,402.65 |
| 06/11/09 | $1,500.00 |
| 07/09/09 | $1,402.66 |
| 08/11/09 | $1,500.00 |
| 09/04/09 | $1,425.00 |
| 10/13/09 | $1,525.00 |
| 11/09/09 | $1,524.42 |

(Doc. 43, Ex. A-7, Payment Receipts at 49-50). After continuing, for a time, to pay amounts which are not clearly evidenced in the record, Marais "suspend[ed] any performance" (i.e. stopped paying altogether) in November, 2010. (Doc. 42, Ex. B, Marais Disc. Resp. at 7).

On January 3, 2011, Marais drafted and sent a letter known as a qualified written request (QWR) by certified mail to Chase. (Doc. 43, Ex. A-10, QWR at 53-54). Chase acknowledged receipt of the QWR on January 6, 2011 in a letter dated January 7. (Doc. 43, Ex. A-11, QWR Receipt Ltr. at 56). The QWR made numerous demands upon Chase but, relevant to this Order, read as follows:

I hereby dispute all late fees, charges, inspection fees, property appraisal fees, forced placed insurance charges, legal fees, and corporate advances charged for this account. Additionally, I believe that my account is in error for the following reasons: payments made during the year 2008 and 2009 were misapplied to the account or declared late when, in fact, they were timely. Late fees were charged despite a written repayment agreement from Chase to the contrary. Despite my paying regularly my mortgage, the monthly amount has kept on fluctuating over the years without any explanation for same. . . . . It is my contention that, although Chase does not have an interest in the loan other than as its servicer. It has unjustly and consistently enriched itself at my expense over the years.

(Doc. 43, Ex. A-10, QWR at 54).

On February 28, 2011, Chase responded to the QWR's substantive inquiries by form letter. (Doc. 42, Ex. A-1, QWR Resp. Ltr. at 1-2). This letter in no way addressed any of Marais' concerns except insofar as it attached copies of her note, mortgage, loan transaction history, annual escrow statements, home appraisal, and payoff quote. *Id. in passim.* However, a review of the attached loan transaction history raises, rather than answers, questions. For example, as mentioned above, Chase set a repayment plan for Marais. (Doc. 43, Ex. A-4, Repay Plan at 26). Marais' receipts show that she paid the amounts required on time according to the plan except for three – one that was 1 day late, one that was 2 days late, and one for which no receipts are in the record as to whether or not it was paid. (Doc. 43, Ex. A-5, Payment Receipts at 28-38). In short, of the payments for which there is a reliable record, only February and November were late. But, notwithstanding, on the 16th or 17th of every month of 2008, Chase assessed Marais a late fee of $53.24. (Doc. 42, Ex. A-1, Loan Trans. Hist. at 69-74). During that same timeframe, Chase frequently assessed fees of $14.00-$15.00 with no apparent explanation. *Id.* Moreover, it noted payments as "UNAPPLIED" by Marais in the amounts of December – $140.34, November – $140.34, October – $118.92, September – $118.92, August – $118.92, July – $118.92, June – $118.92, May – $118.82, April – $118.92, March – $118.76, and February – $118.73. *Id.* Indeed, Chase itself (via a duly appointed Rule 30(b)(6) deponent) was

unable to explain some of these charges and anomalies. (Doc. 43, Ex. C, Summerford Depo. Excerpt at 54:10-54:16, 62:9-62:20, 77:4-78:5).

On this somewhat muddled but nonetheless undisputed record, Marais now moves for partial summary judgment – arguing that Chase' response to her QWR was inadequate and violative of 12 U.S.C. § 2605(e). (Doc. 43, P. Mot. for Part. SMJ *in passim*). Chase moves for summary judgment on all issues and claims – arguing that its response was adequate and that Marais can prove no damages even if the response were judged inadequate.[3] (Doc. 42, D. Mot. for SMJ *in passim*). The summary judgment motions are fully briefed and ripe for decision.[4]

## III.    SUMMARY JUDGMENT STANDARD

"The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009) (citing *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991)). Rule 56(a) of the Federal Rules of Civil Procedure, sets forth that standard: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at

---

[3] Chase apparently takes it for granted that, if it is successful against Marais on the RESPA claim, the Court will again decline to exercise jurisdiction over Marais' state law claims.

[4] Chase also moves to strike a portion of Marais' reply wherein she argues that even if she cannot prove actual damages, she can survive summary judgment by reliance upon the availability of statutory damages. (Doc. 51, D. Mot. to Strike). Because this Opinion concludes that Marais can prove actual damages, the Court does not address whether she is entitled to statutory damages and thus, Chase' motion to strike is moot.

trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When reviewing a summary judgment motion, the Court must view all the facts, evidence, and any reasonable inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *See, e.g.*, *Crawford v. Metro. Gov't*, 555 U.S. 271, 274 n.1 (2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195, n.2 (2004)); *Muncie Power Prods., Inc.*, 328 F.3d at 873 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has the duty to search the entire record to establish

that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *Poss v. Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

## IV.    DISCUSSION

In enacting RESPA

> Congress's intent was "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country."

*Vega v. First Fed. Sav. & Loan Ass'n of Detroit*, 622 F.2d 918, 923 (6th Cir. 1980) (quoting 12 U.S.C. § 2601(a)). "Although the 'settlement process' targeted by the statute was originally limited to the negotiation and execution of mortgage contracts, the scope of the statute's provisions was expanded in 1990 to encompass loan servicing." *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012) (citations omitted). As a remedial statute, RESPA is construed broadly to effectuate its purposes. *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 985-86, n.5 (6th Cir. 2009); *see also Medrano*, 704 F.3d at 665-66 (citations omitted) (internal quotation marks omitted) ("RESPA's provisions relating to loan servicing procedures should be construed liberally to serve the statute's remedial purpose.").

The relevant portions of RESPA[5] are more susceptible to analysis when considered as four parts. First, RESPA provides certain requirements that a consumer's correspondence must meet to constitute a QWR:

---

[5] Dodd-Frank, which was signed into law on July 21, 2010, made a number of changes to RESPA and regulations promulgated since then have further changed the law. Dodd-Frank Wall Street Reform & Consumer Protection Act, Pub. Law No. 111-203, § 1463; 124 Stat. 1376, 2184 (2010); *see also, e.g.*, 12 C.F.R. §§ 1024.35-1024.36 (2014). However, regulation based upon Dodd-Frank occurred after the events in this case and § 1400(c) of Dodd-Frank

(B) Qualified written request. For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--

    (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

    (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B) (2006). Second, having received a QWR, the law places an obligation upon the servicer to respond:

(2) Action with respect to inquiry. Not later than 60 days[6] (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

    (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

    (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

---

delayed the effective date of Title XIV of the Act. Dodd-Frank, Pub. Law No. 111-203, § 1400(c); 124 Stat. 1376, 2136. Thus, the Dodd-Frank changes and resulting regulations are not relevant to this case.

[6] As discussed above, Dodd-Frank made changes to RESPA, including reducing this period to 30 days. Dodd-Frank, Pub. Law No. 111-203, § 1463; 124 Stat. 1376, 2184. As the QWR in this case was sent in January of 2011 and Dodd-Frank was enacted in July of 2010, one might think that Chase should have responded within 30, rather than 60, days. However, § 1400(c) of Dodd-Frank delayed the effective date of Title XIV of the Act and with it, this 60-day to 30-day change. Dodd-Frank, Pub. Law No. 111-203, § 1400(c); 124 Stat. 1376, 2136. Thus, the appropriate period for response was, at the relevant time, 60 days.

> > (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
>
> > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2). Third, having received a QWR, a servicer is forbidden, during a limited response period, to report on the borrower's credit:

> > (3) Protection of credit rating. During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 603 of the Fair Reporting Act [15 U.S.C.S. § 1681a]).

12 U.S.C. § 2605(e)(3). Finally, in the event a violation can be proven, RESPA provides for the recovery of certain limited categories of damages:

> (f) Damages and costs. Whoever fails to comply with any provision of this section shall be liable to the borrower for each such failure in the following amounts:

> > (1) Individuals. In the case of any action by an individual, an amount equal to the sum of--

> > > (A) any actual damages to the borrower as a result of the failure; and

> > > (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $ 1,000.[7]

> . . . .

> > (3) Costs. In addition to the amounts under paragraph (1) or (2), in the case of any successful action under this section, the costs of the action, together with any attorneys[sic] fees incurred in connection with such action as the court may determine to be reasonable under the circumstances.

12 U.S.C. § 2605(f).

---

[7] As above, Dodd-Frank made changes to RESPA, including increasing this amount to $2,000. Dodd-Frank, Pub. Law No. 111-203, § 1463; 124 Stat. 1376, 2184. However, § 1400(c) of Dodd-Frank delayed the effective date of Title XIV of the Act and with it, this $1,000 to $2,000 change. Dodd-Frank, Pub. Law No. 111-203, § 1400(c); 124 Stat. 1376, 2136. Thus, the appropriate figure is $1,000.

Each of these four parts shall be considered – drawing reasonable inferences in favor of each party when considering summary judgment against each.

## A.    Sufficiency of Marais' QWR

For a communication from borrower to servicer to count as a QWR for purposes of § 2605, it must be written and not be a mere notice on a payment medium supplied by the servicer. 12 U.S.C. § 2605(e)(1)(B).  In this case, the correspondence was a letter which denominated itself a QWR. (Doc. 43, Ex. A-10, QWR at 53-54).  It must enable the servicer to identify the name and account of the borrower. 12 U.S.C. § 2605(e)(1)(B)(i).  This did. (Doc. 43, Ex. A-10, QWR at 53 (stating the name, address, telephone, e-mail, and account number of Christine Marais)).  It must also state reasons, to the extent applicable, that the borrower believes the account to be in error and sufficiently detail any other information sought. 12 U.S.C. § 2605(e)(1)(B)(ii).  In this case, the QWR explained that the account was in error because, in addition to other reasons given, "payments made during the year 2008 and 2009 were misapplied to the account or declared late when, in fact, they were timely [and] [l]ate fees were charged despite a written repayment agreement from Chase to the contrary." (Doc. 43, Ex. A-10, QWR at 53-45).  It also sought 22 specific pieces of information, many of which related to the alleged error. *Id.*  There is no reasonable dispute that Marais sent Chase a valid QWR.

## B.    Sufficiency of Chase' Response

12 U.S.C. § 2605(e)(2) provides three ways in which a servicer can validly respond to a QWR.  A servicer can make corrections to the account. 12 U.S.C. § 2605(e)(2)(A).  A servicer, following an investigation, can explain or clarify why the account is already correct. 12 U.S.C. § 2605(e)(2)(B).  Or a servicer can, after an investigation, provide the borrower with a written explanation or clarification that includes information requested and explain why information not provided cannot be obtained or provided by the servicer. 12 U.S.C. § 2605(e)(2)(C).

Because these three methods of compliance are presented in the disjunctive, a servicer need not use all three response methods – indeed, § 2605(e)(2)(A) and (B) are, in most factual scenarios, mutually exclusive. However, common sense suggests, and the statute implies (by using language like "if applicable," "to the extent applicable," and qualifiers like "appropriate,") that, depending on the circumstances, one response method may be preferable above others. *See* 12 U.S.C. § 2605(e)(2). Chase argues against this line of thought. (Doc. 42, D. Mot. for SMJ at 8-9). Chase asserts that it is "entirely within the discretion of the servicer as to which option for responding it chooses to exercise." *Id.* at 9. However, none of the cases it cites for this proposition go quite so far[8] and the consequences of such an argument defy sense. It would, for instance, hardly be broad or liberal construction (as is required for remedial statutes like RESPA) to say that a servicer, presented with a truthful allegation that an account was incorrect, could respond by providing information confirming the error (thereby plausibly meeting 12 U.S.C. § 2605(e)(2)(C)[9] but doing nothing about it. *See Carter*, 553 F.3d at 985-86, n.5; *Medrano*, 704 F.3d at 665-66 (discussing the need to construe RESPA broadly and liberally). Nor would it make sense to allow a servicer to choose to explain a sham or unreasonable belief that the account is correct (thereby plausibly meeting the letter of 12 U.S.C. § 2605(e)(2)(B)) rather than correcting the account pursuant to 12 U.S.C. § 2605(e)(2)(A). Following a QWR, a company is to choose at least one of the disjunctive response options in 12 U.S.C. § 2605(e)(2) but common

---

[8] *See, e.g.*, *Merriweather v. CitiMortgage, Inc.*, 11-15515, 2012 U.S. Dist. LEXIS 137303, *8 (E.D. Mich. Sept. 25, 2012) *and Wienert v. GMAC Mortg. Corp.*, 08-cv-14482, 2009 U.S. Dist. LEXIS 89881, *22-25 (E.D. Mich. Sept. 29, 2009) (holding that there is no duty to comply with all three parts of § 2605(e)(2), rather, a servicer should choose one response option – but not stating or implying that the choice is one of complete discretion); *see also Eichholz v. Wells Fargo Bank, NA.*, 10-cv-13622, 2011 U.S. Dist. LEXIS 128455, *8 (E.D. Mich. Nov. 7, 2011) (holding that failure to respond in accord with § 2605(e)(2)(A, B, or C) is a single RESPA violation because the statute provides a servicer with disjunctive response options – not that a servicer has unfettered discretion in how to respond). In any case, decisions from other district courts are not binding upon this Court.

[9] Moreover, 12 U.S.C. § 2605(e)(2)(C) is an option calculated to meet a request by the borrower for information – not a response to an alleged error in the borrower's account. Thus, where a borrower alleges an error in her account, § 2605(e)(2)(C) is unlikely to be the appropriate response anyway.

sense, plain language, and liberal construction dictate that it must choose the appropriate option under the circumstances.

The undisputed record in this case demonstrates that Marais challenged, in her QWR, the correctness of her account and it is an open question on this factual record, whether that challenge has merit. The loan transaction history created by Chase, though far from clear, shows a large number of "UNAPPLIED" payments and fees with no explanation:

| Date | Amount "UNAPPLIED" | Fee Amount |
|---|---|---|
| 11/26/2007 | $221.21 | - |
| 12/03/2007 | $221.21 | - |
| 01/29/2007 | - | $15.00 |
| 02/23/2008 | $118.73 | - |
| 03/21/2008 | $118.76 | - |
| 03/24/2008 | - | $15.00 |
| 04/22/2008 | $118.92 | - |
| 04/25/2008 | - | $15.00 |
| 05/22/2008 | $118.82 | - |
| 06/23/2008 | $118.92 | - |
| 06/27/2008 | - | $15.00 |
| 07/23/2008 | $118.92 | - |
| 07/25/2008 | - | $14.00 |
| 08/22/2008 | $118.92 | - |
| 08/29/2008 | - | $14.00 |
| 09/22/2008 | $118.92 | - |
| 09/26/2008 | - | $14.00 |
| 10/22/2008 | $118.92 | - |
| 10/29/2008 | - | $14.00 |
| 11/22/2008 | $140.34 | - |
| 11/26/2008 | - | $14.00 |
| 12/22/2008 | $140.34 | - |
| 1/13/2009 | $1,350.51 | - |

(Doc. 42, Ex. A-1, Loan Trans. Hist. at 69-75; *see also* Doc. 43, Ex. C, Summerford Depo. Excerpt at 54:10-54:16, 62:9-62:20, 77:4-78:5 (Chase's Rule 30(b)(6) deponent admitting he does not know what to make of the fees assessed)). In addition, the numerous default notices sent to Marais all indicate payment due dates on the first of each month. (Doc. 43, Ex. A-6, Default Notices at 39-48). The repayment plan worked-out between Chase and Marais, however,

indicates due dates of the 23rd or 24th of each month. (Doc. 43, Ex. A-4, Repay Plan at 26). Yet, nearly every month, regardless of when Marais paid, Chase assessed a late fee of $53.24 on the 16th or 17th of the month. (Doc. 42, Ex. A-1, Loan Trans. Hist. at 69-74).

Thus, when presented with Marais' QWR alleging that her account had incorrectly been assessed fees and that her payments had not been allocated correctly, Chase, pursuant to § 2605(e)(2)(A or B), ought to have had something to say about the matter – either justifying and explaining these anomalies or correcting them.

1. **Chase' Compliance with 12 U.S.C. § 2605(e)(2)(A) – Correcting the Account**

It is undisputed that Chase did not correct the account. (Doc. 43, Ex. B, Chase Disc. Resp. at 5-6 (admitting that it did not correct the account in light of the absence of errors)). This, according to Chase, is because it did not need correcting. *Id.* Thus, there is no dispute that Chase did not comply, or even seek to comply, with 12 U.S.C. § 2605(e)(2)(A).

2. **Chase' Compliance with 12 U.S.C. § 2605(e)(2)(B) – Explaining why the Account is Correct**

A servicer seeking to comply with RESPA may,

> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
>
> (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer . . . .

12 U.S.C. § 2605(e)(2)(B)(i). There are two stumbling blocks in this requirement for Chase. First, is that some explanation is in order. That is, the statute demands "a written explanation or clarification that includes . . . a statement of the reasons for which the servicer believes the account of the borrower is correct . . . ." 12 U.S.C. § 2605(e)(2)(B)(i). Second, is that Chase was obliged to respond "after conducting an investigation . . . ." *Id.* Or, to put it another way, Chase was obliged to investigate Marais' claims.

An investigation is, "[t]he action of investigating; the making of a search or inquiry; systematic examination; careful and minute research." Oxford English Dictionary (2d. ed. 1989). The undisputed testimony from Chase' duly selected deponent, is that Chase investigated nothing. Rather, when Marais' QWR arrived, Chase stamped it received. (Doc. 43, Ex. C. Summerfield Depo. at 22:2-22:10). Then Chase verified the loan number, pulled appropriate documents from their online system, and sent a form letter to Marais enclosing copies of documents from their online system. *Id.* at 22:11-24:16, 27:12-28:10. Chase conducted no search or inquiry, no "systemic examination," to say nothing of "careful and minute research," to test the validity of Marais' complaints. Oxford English Dictionary (2d. ed. 1989); (*see also* Doc. 43, Ex. C. Summerfield Depo. at 22:11-36:21 (Chase stipulates that it has no institutional knowledge of any investigation other than what the form letter and printed documents show)).

Chase also made no effort, beyond what has already been discussed, to explain or clarify why it felt that Marais' account was correct or the fees assessed against her appropriate. The letter Chase sent to Marais was, according to Chase's own testimony, a form letter with no individualized features apart from the list of enclosures. (Doc. 43, Ex. C. Summerfield Depo. at 27:12-28:10). Needless to say, it therefore explained nothing whatsoever about Marais' individual circumstances or her account. (Doc. 42, Ex. A-1, QWR Resp. Ltr. at 1-2). The letter not only does not offer "a written explanation or clarification . . . of [] reasons for which the servicer believes the account of the borrower is correct," it does not even assert that Chase indeed believes Marais' account is correct. *Id.*; 12 U.S.C. § 2605(e)(2)(B)(i).

Chase argues that the enclosures to the letter, were self-explanatory and fulfilled Chase's responsibilities under RESPA. (Doc. 42, D. Mot. for SMJ at 11-13). In some circumstances, this might be a reasonable view. But where, as here, a borrower alleges that payments have been

misapplied and her account has been incorrectly charged fees, it clarifies and explains nothing for the servicer to simply send the borrower new copies of documents she probably already has showing that the fees were indeed charged and the payments unallocated. For example, imagine that you are dining in a restaurant and notice an apparent error on the bill. You question the waiter about the error and he, without comment or dialogue, simply returns with a new copy of the exact same bill. Would you feel you had received a "a written explanation or clarification" or that the waiter had "conduct[ed] an investigation" into the alleged error? 12 U.S.C. § 2605(e)(2)(B). What Chase has done here is no different. Indeed, some of the best evidence in the record supporting Marais' claim that there were mistakes made on her account comes from the very documents Chase included in its supposedly explanatory response. *See supra* p. 13-14. Under the circumstances, and even drawing all reasonable inferences in Chase' favor, Chase did not comply with 12 U.S.C. § 2605(e)(2)(B).

### 3. Chase' Compliance with 12 U.S.C. § 2605(e)(2)(C) – Providing Requested Information

A servicer, seeking to fulfill its obligation to respond to a QWR, may,

> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
>
> (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer . . . .

12 U.S.C. § 2605(e)(2)(C)(i).

Here again, as in its attempt to satisfy § 2605(e)(2)(B), Chase is foiled by its failure to investigate, explain, and clarify. That is, both § 2605(e)(2)(B) and § 2605(e)(2)(C) require a servicer to "conduct[] an investigation" before providing the borrower with a response and that the response must offer an "explanation or clarification." Chase has admitted that it did nothing other than pull a few already-existent documents from its records system and forward those to

Marais along with a generic and uninformative form letter. (Doc. 43, Ex. C. Summerfield Depo. at 22:11-36:21). Had Marais merely asked for copies of her account documents, this would have been an appropriate response and the requirement of investigation would, in this Court's view, have been satisfied by Chase finding the documents in question. However, there is no dispute that Marais asked for, and was thus entitled to, more than that. (Doc. 43, Ex. A-10, QWR at 53-54).

Marais alleged:

> I believe that my account is in error for the following reasons: payments made during the year 2008 and 2009 were misapplied to the account or declared late when, in fact, they were timely. Late fees were charged despite a written repayment agreement from Chase to the contrary. . . . . [Chase] has unjustly and consistently enriched itself at my expense over the years.

*Id.* at 54. Then, in an attempt to obtain information to substantiate these beliefs, Marais asked for, among other things:

> 9. A complete payment history of how those payments were applied, including the amounts applied to principal, interest, escrow, and other charges;
>
> . . . .
>
> 12. The payment dates, purposes of payment and recipient of any and all fees and costs that have been charged to my account;
>
> . . . .
>
> 15. A breakdown of all charges accrued on the account since the date of closing, that includes but is not limited to, late charges, appraisal fees, property inspection fees, forced placed insurance charges, legal fees and recoverable corporate advances:
>
> 16. A statement indicating which covenants of the mortgage and/or note authorize each charge . . . .

*Id.* at 53.

In response, Chase provided Marais a copy of her note, security instrument (mortgage), loan transaction history, escrow disclosure statements, appraisal, and payoff quote. (Doc. 42, Ex. A-1, QWR Resp. Ltr. at 1). While this response met many of the 22 numbered information

requests from Marais, it did not clearly provide the information requested in paragraphs 9, 12, 15, and 16 nor, more importantly, did it "expla[i]n[] or clarif[y]" the issue at the heart of Marais' QWR – that Marais believed her account was in error because payments had been misapplied, fees unjustly assessed, and payments counted late though they had not been. 12 U.S.C. § 2605(e)(2)(C)(i).

Chase would have this Court decide that because it provided documents satisfying some of the individual items of information requested by Marais, that it fully met its responsibilities under RESPA. But RESPA is to be read liberally, not niggardly. *See Carter*, 553 F.3d at 985-86, n.5; *Medrano*, 704 F.3d at 665-66. While this Court does not suggest that a servicer must, in order to avoid liability under RESPA, respond in detail to every aspect of every QWR tendered by a borrower, the servicer must, whatever response it chooses to make, fairly meet the substance of the QWR. In this case, Marais' information requests were generated because of her belief that her payments had been misapplied, fees wrongfully assessed, and payments counted late when they had been timely. (Doc. 43, Ex. A-10, QWR at 53-54). Under the circumstances, RESPA required a response that dealt with this prime concern by correcting the account, investigating and explaining why the account was correct, or investigating and explaining the issue by providing information about it. 12 U.S.C. § 2605(e)(2)(A-C). Chase did none of these. Chase merely spat-out a form response enclosing copies of Marais' account documents. No one at Chase investigated Marais' claims, attempted to understand the problems, or offered Marais the correction or "explanation or clarification" to which she was, by law, entitled.

## C. Timing of Credit Reporting by Chase

Chase was forbidden, under 12 U.S.C. § 2605(e)(3), to report Marais' alleged default for 60 days, beginning on the date Chase received Marais' QWR. Marais alleges that Chase ignored this obligation and reported her anyway. As purported proof, she submits a copy of her Equifax

Credit Report. (Doc. 43, Ex. A-13, Credit Report at 59-61). The report indeed shows that Chase reported late payments for the period of 2008-09. *Id.* However, Marais apparently fails to note that the Equifax report lists the date the account information was reported to Equifax: 04/2011. *Id.* at 61. Since she sent the QWR to Chase on January 3, 2011 and Chase received it on January 6, 2011, any date in April of 2011, except April 1-4, would have been outside the 60-day window.[10] (Doc. 43, Ex. A-10, QWR at 53-54; Doc. 43, Ex. A-11, QWR Receipt Ltr. at 56). Accordingly, while it is likely that Chase did not, in this respect, violate RESPA, there is an issue of fact yet to be resolved as to what day, exactly, Chase reported Marais' delinquency.

## D. Damages

### 1. Damage Types Available

The damages available in a RESPA claim like that confronted here are "actual damages to the borrower as a result of the failure" to comply with RESPA and up to $1,000[11] in additional damages "in the case of a pattern or practice of noncompliance . . . ."[12] 12 U.S.C. § 2605(f)(1)(A-B). If there is no proof to be had of any such damages, a RESPA claim fails. In the past, district courts within this circuit have taken a hard line about what types of damages qualify under § 2605(f)(1)(A). For example, the Middle District of Tennessee said, relying upon other district courts within this circuit (including this district):

> The plaintiff must establish more than a violation. [*Tsakanikas v. JP Morgan Chase Bank N.A.*, 2:11-cv-888, 2012 U.S. Dist. LEXIS 172058, *7 (S.D. Ohio Dec. 4, 2012)]. He or she "must suffer actual, demonstrable damages, and the damages must occur 'as a result of' that specific violation." *Id.* (citing *Eichholz v. Wells Fargo Bank, N.A.*, No. 10-cv-13622, 2011 U.S. Dist. LEXIS 128455, *14

---

[10] Day-counting under the statute excludes Saturdays, Sundays, and legal holidays. *Compare* 12 U.S.C. § 2605(e)(2) (2006) (setting a time of "60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt" of a QWR in which to respond) *with* 12 U.S.C. § 2605(e)(3) (directing a servicer not to report negative credit information during "the 60-day period beginning on the date of the servicer's receipt . . . of a qualified written request"). Sixty days from January 6, 2011, excluding Saturdays, Sundays, Martin Luther King Day (January 17), and Washington's Birthday (February 21), is April 4, 2011.

[11] Under the version of 12 U.S.C. § 2605 effective at the time of the violations.

[12] If a claim is successful the winner may also recover fees and costs. 12 U.S.C. § 2605(f)(3).

> (E.D. Mich. Nov. 7, 2001) (quoting 12 U.S.C. § 2605(f)(1)(A)); *accord Webb v. Chase Manhattan Mortg. Corp.*, No. 2:05-cv-0548, 2008 U.S. Dist. LEXIS 42559, *38-39 (S.D. Ohio May 28, 2008)). The damages must be "causally related to a failure to properly respond to a QWR." *Tsakanikas*, 2012 U.S. Dist. LEXIS 172058, *7. "Costs of preparing and sending a QWR" and "the costs of filing suit will not satisfy" this actual damages requirement. *Id.*

*Dunkle v. Bank of N.Y. Mellon*, 3:11-cv-1242, 2013 U.S. Dist. LEXIS 66359, *16-17 (M.D. Tenn. April 16, 2013) (citations edited for uniformity). In other words, courts in this circuit and district have previously found that the costs of preparing and sending a QWR, as well as costs of filing suit to enforce RESPA, do not satisfy the actual damages requirement. *Tsakanikas*, 2012 U.S. Dist. LEXIS 172058, *10-11. Tracing such decisions to their roots, the rationale was that finding otherwise would mean that every RESPA suit would have damages built-in "because every mortgagor who sent a QWR would suffer actual damages simply by sending the request and regardless of whether the loan servicer's response was deficient." *Id.*; *see also Kevelighan v. Trott & Trott, P.C.*, 09-cv- 12543, 2011 U.S. Dist. LEXIS 56354, *10-11 (E.D. Mich. May 26, 2011) (citing *Lal v. Am. Home Servicing, Inc.*, 680 F. Supp. 2d 1218, 1223 (E.D. Cal. 2010)).

However, the Sixth Circuit Opinion, issued regarding an earlier decision in this case, implies a new course for the courts in this circuit. *Marais*, 736 F.3d at 720-22. In reversing this Court, the Sixth Circuit, commented:

> In addition [to the other reasons Marais competently alleged damages], the district court's determination that costs Marais incurred associated with preparing her QWR did not constitute actual damages, did not take into account Marais's argument that those costs were for naught due to Chase's deficient response, i.e., her QWR expenses became actual damages when Chase ignored its statutory duties to adequately respond. The district could should[sic] consider this argument on remand.

*Marais*, 736 F.3d at 721. The Circuit, in ruling <u>for</u> Marais, would not likely have suggested consideration of this argument if it thought our prior precedent clearly settled the issue <u>against</u> Marais. Since our prior precedent, reviewed above, would, if followed, settle the issue against

Marais, the Court takes the Circuit's statement as a directive to reconsider the analysis employed in previous district decisions before the Circuit does it for us. *See also Mellentine v. Ameriquest Mortg. Co.*, 515 F. App'x 419, 424-25 (6th Cir. 2013) (showing the softening stance on qualifying damages by holding that a plaintiff who alleged amorphous "damages in an amount not yet ascertained, to be proven at trial" could satisfy the actual damages element); *Houston v. U.S. Bank Home Mortg. Wis. Servicing*, 505 F. App'x 543, 548 n.6 (6th Cir. 2013) (holding that even emotional damages could constitute "actual damages" for purposes of § 2605(f)(1)(A)).

This Court still recognizes that there is some appeal in the argument that any RESPA violation will have damages built-in if actual damages are construed broadly enough to encompass costs associated with the QWR and suit to enforce RESPA. But, upon reflection, such arguments prove too much. Every civil case, after all, has some damages built-in. Recklessly discharging a gun in the air would satisfy most elements of a tort. But the claim is not complete until the bullet turns Earthward and strikes something – causing damages. Damages are no more built-in to a RESPA suit than they are any tort, or any other cause of action that cannot and will not be brought without damages. That the deleterious consequences of the delict act are prerequisites to the claim, is not a good reason to exclude them as damages.

The Court also recognizes that there is great merit in the general proposition that damages are consequences that flow from the wrongful action and must, therefore, succeed the wrongful act in time. A headache that began hours before a car crash cannot be the result of the crash or considered as damages from it. However, in some cases, a wrongful act can cause damages retroactively. If a fellow pays a painter to paint his house, the payment is a cost. If the painter in fact, paints the house, the cost remains a cost. If the painter does not paint the house and instead,

absconds with the money, the cost (though already incurred and paid) transmogrifies into damages.

The term "actual damages" is not defined within RESPA. 12 U.S.C. § 2602 (2006) (definitions do not list "actual damages" or even "damages"). Thus, the Court turns to the common meaning, "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses." Black's Law Dictionary (9th ed. 2009). In addition, the Court notes that, "[a]s a remedial statute, RESPA is construed broadly to effectuate its purposes." *Marais*, 736 F.3d at 719 (citing *Carter*, 553 F.3d at 985-86, n.5; *Medrano*, 704 F.3d at 665-66). Hence, with these considerations in mind, and looking at the generous treatment given to damages in *Mellentine*, and *Houston*, as well as by the Sixth Circuit in this case, the Court construes actual damages as encompassing all provable injuries that are the result of Chase' response to receiving the QWR. Or, to put a finer point on it, all expenses, costs, fees, and injuries fairly attributable to Chase's failure to respond appropriately to the QWR, even if incurred before the failure to respond, are included.[13] In addition, such damages include any losses or injury resulting from damaged credit as a result of Chase' possible improper reporting to consumer reporting agencies.

### a.    Costs of the QWR

Marais submits receipts showing postage for certified mailing of the QWR. (Doc. 43, Ex. A-10, QWR at 55 (certified mail receipts)). Though she incurred these expenses and paid them prior to Chase's deficient response, these are damages. That is, when they were incurred they were merely the transaction costs incident to correcting Marais' account or obtaining information

---

[13] However, litigation costs and fees are not included in "actual damages" even though, under a liberal reading of the term, they otherwise would be. This is because 12 U.S.C. § 2605(f)(3) expressly provides for cost and fee recovery following a "successful action" "[i]n addition to" actual damages. 12 U.S.C. § 2605(f)(3) (emphasis added). In other words, including fees and costs within "actual damages" would contradict the concept of costs and fees being "[i]n addition to" "actual damages" and render 12 U.S.C. § 2605(f)(3) a nullity.

about her loan.  However, when Chase failed to do that which it was obligated to do, these costs metamorphosed into damages.  Thus, it was Chase's failure that caused the metamorphosis; thus, it was Chase that caused the damages; hence, these damages, née costs, are "actual damages to the borrower as a result of [Chase's] failure . . . ." 12 U.S.C. § 2605(f)(1)(A).

### b.    Interest and Unapplied Sums

The finding above, that Marais can establish damages for QWR expenses, already defeats Chase's motion for summary judgment.  Thus, it is not strictly necessary to address whether there might be other damages.[14]  However, now that the record is developed, the Court feels it is appropriate to correct a misunderstanding that seems to have arisen.  The Sixth Circuit opinion suggests that "interest damages flowed from Chase's deficient response to [Marais'] QWR because any additional interest she paid on the principal balance after Chase deficiently responded to her QWR on February 28, 2011, would flow from the deficient response." *Marais*, 736 F.3d at 721.  However, it is undisputed that Marais made no payments of any kind after the end of 2010. (Doc. 42, Ex. B, Marais Disc. Resp. at 7).  Thus, though it might once have been alleged, it is now undisputed that there are no damages of the kind that the Sixth Circuit found significant in reversing this Court.

Yet, there is at least a question of fact as to whether there are other types of actual damages attributable to Chase's failure to properly respond to the QWR.  The loan transaction history, though far from clear, shows a large number of "UNAPPLIED" payments and fees with no explanation. *See supra* p. 13 (summarizing, in table format, Doc. 42, Ex. A-1, Loan Trans. Hist. at 69-74); (*see also* Doc. 43, Ex. C, Summerford Depo. Excerpt at 54:10-54:16, 62:9-62:20,

---

[14] For the same reason, it is not necessary to determine whether actual damages must be shown to maintain a cause of action or whether the availability of statutory damages would be sufficient (as Marais argues in her reply). (Doc. 50, P. Reply in Supp. of Partial SMJ at 11-16).  Thus, Chase' motion to strike that section of Marais' reply is moot. (Doc. 51, D. Mot. to Strike).

77:4-78:5 (Chase's Rule 30(b)(6) deponent admitting he does not know what to make of the fees assessed)). In addition, the numerous default notices sent to Marais all indicate payment due dates of the first of the month. (Doc. 43, Ex. A-6, Default Notices at 39-48). The repayment plan worked-out between Chase and Marais indicates due dates on the 23rd or 24th of each month. (Doc. 43, Ex. A-4, Repay Plan at 26). But, nearly every month, regardless of when Marais paid, Chase assessed a late fee of $53.24 on the 16th or 17th of the month. (Doc. 42, Ex. A-1, Loan Trans. Hist. at 69-74).

In other words, on this record, there is a question of fact as to whether the principal amount to be repaid, as stated by Chase, was accurate. It may well have been. But, assuming, *arguendo*, that the amount was inaccurate, some interest damages would likely be proper. That is, interest is paid based upon principal balance outstanding. If that goes up, the proportion of interest in each payment goes up (though the total payment amount remains the same). If that goes down, the reverse is true. If Chase had responded to the QWR by correcting Marais' account (still assuming that it needed correction), the payments Marais made prior to ceasing performance in 2010 would have been corrected, allocated to their rightful place, and thus would have remained payments. However, because Chase did not correct Marais' account and this lawsuit had to be filed, those misapportioned payments, in this hypothetical, are no longer payments – they are, to the extent they were misapportioned, damages.

## 2. Rule 26(a) Damages Disclosures and Rule 37 Sanctions

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires a party to make initial disclosure of "a computation of each category of damages claimed by the disclosing party . . . ." Chase's motion argues that Marais' failure to give a detailed account of her damages in an initial disclosure more-or-less automatically results in the exclusion of all damage-proving evidence and thus, the failure of Marais' lawsuit. (Doc. 42, D. Mot. for SMJ at 17-22). The Civil Rules,

24

however, are not so uncivil as to automatically punish a lack of detail in early disclosures with what amounts to default. Rather, "[i]f a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Fed. R. Civ. P. 37(a)(3)(A). True, the Sixth Circuit has sometimes remarked, "'Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Big Lots Stores, Inc. v. Luv N' Care*, LTD, 302 F. App'x 423, 430 (6th Cir. 2008) (quoting *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)). And true, this Court has previously stated, "Rule 37 requires virtually automatic preclusion of information not disclosed pursuant to Rule 26(a)(1)." *Webb v. Chase Manhattan Mortg. Corp.*, 2:05-cv-548, 2008 U.S. Dist. LEXIS 42559, *40 (S.D. Ohio May 28, 2008) (Smith, J.).[15] However, Rule 37(c)(1) also provides some less draconian options if the circumstances warrant it:

> (c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.
>
> > (1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> >
> > > (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> > >
> > > (B) may inform the jury of the party's failure; and
> > >
> > > (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

---

[15] It should be noted that in *Webb*, unlike here, this Court confronted a situation where a Plaintiff had not only not disclosed a category of damages in her Rule 26(a) disclosures, she had also entirely failed to plead them. *Webb*, 2008 U.S. Dist. LEXIS 42559, *40.

Fed. R. Civ. P. 37(c)(1)(A-B). In other words, notwithstanding the tough language in parts of Rule 37(c)(1), the remainder of the Rule allows a Court to exercise its discretion to impose a large range of discovery sanctions upon a violator including, if the Court deems the violation "substantially justified" or "harmless," no sanction at all.

In this case, Marais' damages disclosure with respect to her RESPA claim read, "Count Two: $1,000 plus attorneys' fees and costs." (Doc. 42, Ex. C, Marais Int. Disc. at 2). As RESPA, § 2605(f), limits damages categories to "actual damages" and statutory damages based on a pattern and practice of non-compliance, this may be fairly read as a statement that Marais believed her damages in the categories of actual and statutory damages were $1,000. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring disclosure of "each category" of damages).

What is missing from Marais' disclosure, even under this generous reading, is the "computation" required by Rule 26(a)(1)(A)(iii). The disclosure gives no indication of whence comes the $1,000 figure. Yet, the complaint alleged unallocated payments by Marais and then stated, "Plaintiff's actual damages are equal to the amount of money Defendant converted plus interest and disgorgement interest, and statutory damages under . . . RESPA." (Doc. 1, Compl. at ¶¶ 29-32, 56). The Sixth Circuit found that this allegation sufficiently alleged actual damages under RESPA and remarked that "[a] reasonable inference arising from these allegations is that because Chase [] failed to correct or investigate the misapplied payments, Marais paid interest on a higher principal balance than she should have." *Marais*, 736 F.3d at 720. Moreover, the receipt showing the amount of postage that Marais paid in mailing the QWR to Chase was attached to the complaint as exhibit C. (Doc. 2, Ex. C, QWR at 3).[16] In short, while Marais' damages computation was missing from her Rule 26 disclosure, Chase cannot seriously claim to be

---

[16] Exhibits B-E to the complaint were, for reasons not evident to the Court, filed under a docket number separate from the complaint.

surprised by the origin of the damages Marais seeks.  Moreover, this case is not on the eve of

trial and the parties shall still have ample opportunity, in the wake of this opinion, to conduct

discovery and brief the issue of damages.[17]  Accordingly, Marais' failure to specifically offer a

break-down and computation of damages in a document exchanged early in discovery but after

the complaint was filed, was harmless.  No sanction shall be imposed.

### V.    CONCLUSION

Chase's motion for summary judgment (Doc. 42) is **DENIED**.  Marais' motion for partial

summary judgment (Doc. 43) is **GRANTED in part** and **DENIED in part**.  Chase' motion to

strike (Doc. 51) is **DENIED as moot**.

Even drawing all reasonable inferences in favor of Chase, Chase violated RESPA in that

it failed to appropriately respond to Marais' QWR.  Drawing all reasonable inferences in favor

either party, there is a question of fact as to whether Chase violated RESPA's requirement that it

delay credit reporting about Marais during the 60-day period after receiving Marais' QWR.

Finally, drawing all reasonable inferences in favor of Marais, Marais introduced evidence of

actual damages sufficient to create a genuine issue of material fact as to whether she sustained

such damages.  And thus, the question of whether statutory damages can preserve a claim with

no actual damages is moot.

The Clerk is directed to **REMOVE** documents 42, 43, and 51 from the Court's pending

motions list.

The parties are directed to take whatever discovery is appropriate to clarify how

payments were allocated, why fees were assessed, what interest, if any, was overpaid, when

Chase reported Marais' account to consumer reporting agencies, what actual damages Marais

---

[17] However, if, in that post-additional-discovery briefing, Marais is not clear about what her damages are and how
each is the result of Chase' failure to appropriately respond to her QWR, Marais will find herself in the position of
having proven a RESPA violation with no damages.  Which is to say, her case will be over.

suffered as a result of Chase' deficient response to the QWR and (if applicable) consumer reporting violations, and whether Chase had a pattern and practice of noncompliance with RESPA. This limited discovery period shall begin on the date this order is issued and shall extend for 90 days. 30 days after the conclusion of discovery (which is 120 days from the date of this Order), Marais is **ORDERED** to submit briefing to this Court on the issue of damages. This briefing should address any actual damages, pattern and practice allegations with associated damages, exact dates of Chase' consumer reporting regarding Marais and associated damages, and any attorneys' fees and costs sought pursuant to 12 U.S.C. § 2605(f)(3). Chase shall respond 30 days after Marais' brief and Marais, should she chose to reply, shall do so no later than 15 days after that.

In light of the Sixth Circuit's reversal and this Court's exercise of jurisdiction over Marais' RESPA claim, the Court retains jurisdiction over Marais' state law claims because they are part of the same controversy. *See* 28 U.S.C. § 1367 (2012). Though successive motions for summary judgment are not typical, the Court will consider, should the parties wish to file them, summary judgment motions on the state law claims also. If the parties file such motions, they shall be briefed on the same schedule as the damages briefing.

Should the parties wish to engage in settlement discussions or mediation, the Court will, upon joint motion of the parties, stay the foregoing schedule. The parties may contact my chambers or Judge Abel's chambers should they desire assistance in arranging mediation or other aids to settlement.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**